Slip. Op. 18-23

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DYNAENERGETICS U.S. INC., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Mark A. Barnett, Judge |
| Defendant, | Court No. 16-00045 |
| MAVERICK TUBE CORPORATION, | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's scope determination and its instructions to U.S. Customs and Border Protection associated with the scope determination.]

Dated:  March 16, 2018

<u>Diana Dimitriuc Quaia</u>, Arent Fox LLP, of Washington, DC, argued for Plaintiff.  With her on the brief were <u>John M. Gurley</u> and <u>Aman Kakar</u>.

<u>Justin R. Miller</u>, Senior Trial Counsel, International Trade Field Office, Civil Division, U.S. Department of Justice, of New York, NY, argued for Defendant.  With him on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel on the brief was <u>Paul Keith</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Robert E. DeFrancesco, III</u>, Wiley Rein LLP, of Washington, DC, argued for Defendant-Intervenor.  With him on the brief were <u>Alan H. Price</u> and <u>Adam M. Teslik</u>.

Barnett, Judge: This action involves a challenge to a U.S. Department of

Commerce ("Commerce" or the "agency") scope determination for the antidumping and

countervailing duty orders on *Certain Oil Country Tubular Goods from the People's

Republic of China,* 75 Fed. Reg. 28,551 (Dep't Commerce May 21, 2010) (am. final

determination of sales at less than fair value and antidumping duty order) ("*AD Order*");

*Certain Oil Country Tubular Goods from the People's Republic of China*, 75 Fed. Reg.

3,203 (Dep't Commerce Jan. 20, 2010) (am. final affirmative countervailing duty

determination and countervailing duty order) ("*CVD Order*") (collectively, "*AD & CVD

Orders*" or "the *Orders*").  Before the court is the remand redetermination issued

pursuant to *DynaEnergetics U.S. Inc. v. United States*, 41 CIT __, 203 F. Supp. 3d 1351

(2017).  *See* Final Results of Redetermination Pursuant to Court Remand ("Remand

Results"), ECF No. 53-1.[1]  DynaEnergetics U.S. Inc. ("Plaintiff" or "DynaEnergetics")

challenges the Remand Results in which Commerce determined that Plaintiff's

customized tubing for perforating gun carriers ("gun carrier tubing") is within the scope

of the *Orders*.  *See generally* Pl.'s Comments on the U.S. Department of Commerce's

Remand Redetermination ("Pl.'s Comments") at 5-26, ECF No. 57; Remand Results.

Plaintiff also challenges Commerce's instructions to U.S. Customs and Border

Protection ("Customs" or "CBP") associated with this ruling.  Pl.'s Comments at 26-28.

---

[1] Defendant filed the public version of the administrative record ("PR") at ECF Nos. 19-2 and 19-4; the confidential version of the administrative record ("CR") at ECF Nos. 19-3 and 19-5; Commerce's instructions to Customs at ECF Nos. 27-1, 27-2; and the public remand administrative record ("PRR") at ECF Nos. 55-2, 55-3.  The parties also submitted joint appendices containing record documents cited in their briefs. *See* Confidential Joint App. ("CJA"), ECF No. 66; Public Joint App. ("PJA"), ECF No. 67. The court references the public versions of the relevant record documents throughout this opinion, unless otherwise specified.

Defendant, the United States, and Defendant-Intervenor, Maverick Tube Corporation,

defend Commerce's Remand Results with respect to both issues.  *See generally* Def.'s

Resp. to Comments on the Remand Redetermination ("Def.'s Resp."), ECF No. 60;

Def.-Int. Maverick Tube Corporation's Reply Comments on Final Results of

Redetermination Pursuant to Court Remand ("Def.-Int's Resp."), ECF No. 64.[2]  For the

reasons discussed below, the court sustains Commerce's Remand Results.

BACKGROUND

On May 5, 2009, Commerce initiated antidumping and countervailing duty

investigations of certain oil country tubular goods ("OCTG") from the People's Republic

of China ("PRC").  *Certain Oil Country Tubular Goods from the People's Republic of*

*China*, 74 Fed. Reg. 20,671 (Dep't Commerce May 5, 2009) (initiation of antidumping

duty investigation) ("*AD Investigation*"); *Certain Oil Country Tubular Goods from the*

*People's Republic of China*, 74 Fed. Reg. 20,678 (Dep't Commerce May 5, 2009)

(initiation of countervailing duty investigation) ("*CVD Investigation*").  Commerce

subsequently issued the antidumping and countervailing duty orders on May 21, 2010,

and Jan 20, 2010, respectively.  *See generally AD & CVD Orders*.  The *Orders* defined

their scope as follows:

> [C]ertain OCTG, which are hollow steel products of circular cross-section,
> including oil well casing and tubing, of iron (other than cast iron) or steel
> (both carbon and alloy), whether seamless or welded, regardless of end
> finish (e.g., whether or not plain end, threaded, or threaded and coupled)
> whether or not conforming to American Petroleum Institute (''API'') or non-
> API specifications, whether finished (including limited service OCTG
> products) or unfinished (including green tubes and limited service OCTG

---

[2] Defendant-Intervenor filed public and confidential versions of its responsive
comments.  *See* Def.-Int.'s Resp.; Confidential Def.-Int. Maverick Tube Corporation's
Reply Comments on Final Results of Redetermination Pursuant to Court Remand, ECF
No. 63.  The court references the public version.

> products), whether or not thread protectors are attached. The scope of the order also covers OCTG coupling stock. Excluded from the scope of the order are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

*AD Order*, 75 Fed. Reg. at 28,553.[3]   The *Orders* also included relevant U.S. Harmonized Tariff Schedule ("HTSUS") subheadings, which Commerce provided for "convenience and customs purposes only," noting that the "written description of the scope of the order is dispositive." *Id*.

On September 25, 2015, Plaintiff, a U.S. producer of oil and gas well perforating systems that imports gun carrier tubing for use in those systems, requested a scope ruling to determine whether its gun carrier tubing falls outside the scope of the *Orders*. Request for a Scope Ruling on Certain Tubing for Perforating Gun Carriers (Sep. 25, 2015) ("Scope Ruling Request"), PJA Tab 1, PR 1-6, ECF No. 67.  On February 12, 2016, based on its analysis of the factors enumerated in 19 C.F.R. § 351.225(k)(1), Commerce determined that DynaEnergetics' gun carrier tubing is within the scope of the *Orders*.  Final Scope Ruling on DynaEnergetics U.S. Inc.'s Perforating Gun Carriers (February 12, 2016) ("Final Scope Ruling") at 10-13, PJA Tab 8, PR 20, ECF No. 67. Plaintiff timely challenged Commerce's scope determination and the accompanying instructions to Customs before this court.  *DynaEnergetics U.S. Inc.*, 203 F. Supp. 3d at 1354.  Defendant requested a remand to "reconsider [Commerce's] findings in light of DynaEnergetics' contentions" before the court.  *Id*.  As the court previously noted, "Defendant acknowledged that the agency's analysis was cursory and did not fully

---

[3] The scope of both the *Orders* is the same.  *Compare AD Order*, 75 Fed. Reg. at 28,553, *with CVD Order*, 75 Fed. Reg. at 3,204.  For ease of reference, the court refers only to the scope of the *AD Order*.

address [Plaintiff's] arguments." *Id*. at 1355.  The court granted the request and

remanded the matter for the agency to reconsider the scope determination at issue and,

if appropriate, its instructions to Customs associated with the scope determination.  *Id.*

at 1356.  Pursuant to the court's order, Commerce timely issued its Remand Results on

June 7, 2017, continuing to find that Plaintiff's gun carrier tubing is within the scope of

the *Orders*.  Remand Results at 1.  Additionally, with respect to the customs instructions

associated with its scope determination, Commerce found that the customs instructions

were proper.  *Id*. at 1-2.  Plaintiff now challenges both determinations.  It requests that

the court remand Commerce's determination pursuant to 19 C.F.R. § 351.225(k)(1) for

the agency to initiate a scope inquiry and consider the factors listed in 19 C.F.R.

§ 351.225(k)(2).  Pl.'s Comments at 24-26.  Further, in the event the Court does affirm

the Remand Results, Plaintiff requests that the Court order "that suspension of

liquidation be imposed only on a prospective basis."  Pl.'s Comments at 28.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(vi) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi)(2012),[4] and 28 U.S.C. § 1581(c).  The

court will uphold an agency determination that is supported by substantial evidence and

otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence

is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir.

2001) (internal quotation marks and citation omitted).  Additionally, "the possibility of

---

[4] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code and
all citations to the U.S. code are to the 2012 edition, unless otherwise specified.

drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence." *Id*.

(citation omitted).

DISCUSSION

## I.    Legal Framework

Because descriptions of merchandise contained in the scope of an antidumping

or countervailing duty order must be written in general terms, issues may arise as to

whether a particular product is included within the scope of such an order.  *See* 19

C.F.R. § 351.225(a).  When those issues arise, Commerce's regulations direct it to

issue "scope rulings" that clarify whether a particular product falls within the purview of

an antidumping or countervailing duty order's scope.  *Id*.  Although there are no specific

statutory provisions that govern the interpretation of the scope of an order, the

determination of whether a particular product is included within the scope of an order is

governed by case law and the regulations published at 19 C.F.R. § 351.225.  *Meridian*

*Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citing *Shenyang*

*Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir.

2015); *see also Eckstrom Indus.*, 254 F.3d at 1071–72 (noting that 19 C.F.R. § 351.225

governs a determination of whether an antidumping duty order covers a particular

product).[5]

Commerce's inquiry must begin with the relevant scope language.  *See Duferco*

*Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (explaining that the

---

[5] The regulations establish a two-step process, and "case law has added another layer
to the inquiry."  *Meridian Prods.*, 851 F.3d at 1381 (distinguishing between Commerce's
examination of the "text of an order's scope" and the sources enumerated in 19 C.F.R. §
351.225(k)(1), discussed herein).

language in the order is the "predicate for the interpretive process" and the

"cornerstone" of a scope analysis"); *Mid Continent Nail Corp. v. United States*, 725 F.3d

1295, 1302 (Fed. Cir. 2013); *Meridian Prods.*, 851 F.3d at 1381.  If the language is

ambiguous, Commerce interprets the scope "with the aid of" the sources set forth in 19

C.F.R. § 351.225(k).  *Meridian Prods.*, 851 F.3d at 1381; *Duferco Steel*, 296 F.3d at

1096-97; *Mid Continent Nail Corp.*, 725 F.3d at 1302.  Specifically, Commerce first

considers the "[t]he descriptions of the merchandise contained in the petition,

[Commerce's] initial investigation, and the [prior] determinations of [Commerce]

(including prior scope determinations) and the [International Trade] Commission."  *Mid

Continent Nail Corp.*, 725 F.3d at 1302 (quoting 19 C.F.R. § 351.225(k)(1) (the "(k)(1)

factors")).

If the (k)(1) factors are dispositive, Commerce issues a final scope ruling. *See* 19

C.F.R. § 351.225(d).  To be dispositive, the (k)(1) factors "must be 'controlling' of the

scope inquiry in the sense that they definitively answer the scope question."  *Sango Int'l

L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).  When the (k)(1) factors are

not dispositive, Commerce considers the sources in subsection (k)(2) of the regulation.

*See* 19 C.F.R. § 351.225(k)(2).[6]

---

[6] Specifically, Commerce will consider: "(i) [t]he physical characteristics of the product;
(ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product;
(iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the
product is advertised and displayed." 19 C.F.R. § 351.225(k)(2) (the "(k)(2) factors").
Those factors are sometimes referred to as the *Diversified Products* factors because
they were first articulated in *Diversified Prods. Corp. v. United States,* 6 CIT 155, 572 F.
Supp. 883 (1983).  *See Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350,
1355 & n.2 (Fed. Cir. 2010).

"Commerce is entitled to substantial deference with regard to its interpretations of

its own antidumping duty orders." *King's Supply Co., LLC v. United States*, 674 F.3d

1343, 1348 (Fed. Cir. 2012).  Nevertheless, "Commerce cannot interpret an

antidumping order so as to change the scope of th[e] order, nor can Commerce interpret

an order in a manner contrary to its terms." *Eckstrom Indus.*, 254 F.3d at 1072 (internal

quotation marks and citation omitted).  When a party challenges a scope determination,

the court's objective is to determine whether the scope of the order "contain[s] language

that specifically includes the subject merchandise or may be reasonably interpreted to

include it." *Duferco Steel, Inc.*, 296 F.3d at 1289.  The agency's factual findings

resulting from analyzing the (k)(1) factors are reviewed for substantial evidence.

*Meridian Prods.*, 851 F.3d at 1382.

## II.   Analysis

### a. Commerce's Determination

The relevant language of the scope of the *Orders* is reproduced above.

Commerce determined that the scope of the *Orders* covers "certain OCTG"; therefore,

"all language thereafter is predicated on the merchandise being OCTG."  Remand

Results at 18.  Commerce reviewed the definitions of OCTG from the International

Trade Commission ("ITC") and the American Iron and Steel Institute ("AISI") and

ultimately adopted the ITC's definition of OCTG as "tubular steel products used in oil

and gas wells and include casing, tubing, and coupling stock of carbon and alloy steel."

*Id*. at 19-20.  Relying on the language of the *Orders* covering "certain OCTG, which are

hollow steel products of circular cross-section," and the ITC's definition of OCTG,

Commerce interpreted the scope to cover hollow steel products of circular cross-section

used in oil and gas wells, except for products expressly excluded from the scope.  *Id*. at

17-21.  As a result, Commerce determined that the scope included, but was not limited

to, tubing, casing, and coupling stock.  *Id*. at 20-21, 31.  Moreover, Commerce

determined that OCTG encompasses those tubular steel products used in well drilling

and extracting oil or gas to the surface, and extends to those products used in "other

functions associated with an oil and gas well."  *Id*. at 31.

      Comparing Plaintiff's description of the gun carrier tubing and the physical

characteristics of the product to this understanding of the scope, Commerce determined

that the gun carrier tubing satisfied Commerce's definition of OCTG and the scope

language.  *Id*. at 20.  The gun carrier tubing satisfied the scope's requirement that

subject merchandise be "'hollow steel products of circular cross-section . . . of iron

(other than cast iron) or steel (both carbon and alloy), whether seamless or welded,

regardless of end finish (e.g., whether or not plain end, threaded, or threaded and

coupled)."  *Id*.  Moreover, Plaintiff's description that "the gun carrier tubing is a tubular

steel product used in oil and gas wells" satisfied the definition of OCTG that Commerce

adopted.  Remand Results at 20.

### b. Commerce's Interpretation of OCTG is Consistent With The Scope Language and the (k)(1) Factors

      In challenging the Remand Results, Plaintiff argues that Commerce gave "no

consideration" to certain (k)(1) factors, such as the petition, Commerce's investigation,

and Commerce's statements in a separate scope proceeding, "other than to dismiss this

evidence without justification."  Pl.'s Comments at 6.  Plaintiff argues that, for the

evidence it did consider, Commerce unjustifiably adopted select statements and

disregarded others.  *Id*.  Contrary to Plaintiff's assertions, Commerce reviewed each of

the (k)(1) factors and explained the reasoning supporting its determination.  The

agency's factual findings regarding the (k)(1) factors are supported by substantial

evidence.

i.  The Petition

Petitioners' proposed scope initially covered "certain OCTG, hollow steel

products of circular cross section, including *only* oil well casing and tubing . . . ."  Scope

Ruling Request, Ex. 10 (Petitions for the Imposition of Antidumping and Countervailing

Duties) (Apr. 8, 2009) ("Petition") at 5 (emphasis added).  In response to the agency's

questions regarding the language of the scope and whether it was intended to cover

couplings (whether or not attached to the subject OCTG), coupling stock, and thread

protectors (whether or not attached to the subject OCTG), petitioners revised their

scope language to include coupling stock.  *See* Scope Ruling Request, Ex. 11 (Resp. to

the Department's Questionnaire Regarding Vol. I of the Petitions for the Imposition of

Antidumping and Countervailing Duties) (Apr. 22, 2009) ("Petitioners' QR Resp.") at 7.

The revised proposed scope, in relevant part, read: "The merchandise covered by the

investigation consists of certain oil country tubular goods ("OCTG"), hollow steel

products of circular cross-section, including *only* oil well casing and tubing, of iron . . .

This scope covers coupling stock."  Petitioners' QR Resp. at 2-3, 6-7 (emphasis added).

Petitioners also added certain tariff classifications to the proposed scope.  *Id*.

When Commerce announced the initiation of the investigations, Commerce

removed the word "only" from the language of the scope so that the scope covered

"certain [OCTG] . . . including oil well casing and tubing . . . ."  *See AD Investigation*, 74

Fed. Reg. 20,677; *CVD Investigation*, 74 Fed. Reg. 20,681.  Commerce's revised scope

language was also included in the *AD & CVD Orders*.

Plaintiff places great emphasis on the inclusion of the word "only" in the proposed

scope as indicating that the scope of the *Orders* covers only casing, tubing, and

coupling stock.  Pl.'s Comments at 15-19.  In evaluating this argument in the Remand

Results, the agency considered the evolution of the scope language and noted that the

limiting language initially included in the petition was excluded from the final *Orders*.

Remand Results at 24.  Therefore, the agency found that "the proposed scope

language from the original petitions is not determinative and, if anything, actually weighs

against reading limitations into the final scope language that are no longer there." *Id.*

To the extent that Plaintiff is suggesting that Commerce was required to

determine whether its gun carrier tubing would have been covered by the description of

the scope provided in the original petition, Plaintiff is wrong.  Commerce, as the

investigating authority, has the authority to determine the scope of the merchandise

being investigated and its determination may differ from that proposed in the petition.

*See Duferco Steel*, 296 F.3d at 1096.  When that occurs, as it did here, it is the scope of

any resulting antidumping or countervailing duty order that is relevant for determining

the coverage of the order and the proposed scope contained in the petition is relevant

only to the extent that it aids in the understanding of the scope language of the order.

*See* 19 C.F.R. § 351.225(k)(1) (listing "the description of merchandise contained in the

petition" as a source that the agency "will take into account" in making its scope

determinations); *Duferco Steel*, 296 F.3d at 1097 (stating that the petition may provide

guidance to the interpretation of an order, but "cannot substitute for language in the

order itself.").   Any changes in the language may have expanded or restricted the

coverage of the proposed scope, but it is the final scope language that is determinative.

*See Duferco Steel*, 296 F.3d at 1096-97

Plaintiff faults Commerce for simply noting the change in language between the

proposed scope and the final scope without "analyz[ing] the description of the

merchandise in the Petition," Pl.'s Comments at 19, "in light of th[e] context and history

of OCTG scope definitions, which was specifically referenced in the Petition,"  *id.* at 17.

Plaintiff argues that the petitioners drafted their proposed scope to be "essentially

identical to orders on OCTG from Argentina, Italy, Korea, and Mexico imposed in 1995

and subject to five-year reviews in 2007."  *Id.* at 16 (internal quotations and citation

omitted).  Plaintiff states that the antidumping duty order on OCTG from Italy used the

identical limiting language contained in the petition.  *Id.* at 16.

Plaintiff's references to the scope coverage of these other investigations and the

antidumping duty order on OCTG from Italy do not detract from the agency's reasoning

in this case when there are substantive differences between the scope language of the

referenced cases and of the *Orders*.  Here, after the agency deliberately deleted the

word "only" from the proposed scope, it was reasonable for Commerce not to interpret

the scope in the same manner as other previous orders that included that limiting term.

As Commerce explained in the Remand Results, if Commerce had "intended to limit the

scope and the definition of OCTG to oil well casing and tubing, it could have done so by

adopting the language from the petitions that DynaEnergetics references."  Remand

Results at 24.

Plaintiff also posits that Commerce removed the word "only" from the proposed

scope to accommodate the addition of coupling stock to the definition so that the scope

language would be grammatically correct.  Pl.'s Comments at 19.   Plaintiff points to no

evidence suggesting that the deletion of the limiting language was only for grammatical

purposes and not to expand the scope.  Even if the court assumes that Commerce was

primarily concerned with grammatical correctness, it could have reflected such intent by

simply inserting "coupling stock" into the first sentence to state that the scope covered

"certain OCTG . . . including only oil well casing, tubing, and coupling stock."

Plaintiff also contends that the scope of the *Orders* cannot be interpreted to cover

all hollow steel products of circular cross section used in an oil well because if that were

true, there would have been no need for Commerce or the ITC to specifically add

coupling stock to the final scope description.  *Id.* at 21.  Likewise, however, if the scope

of the *Orders* was limited to casing, tubing, and coupling stock, as Plaintiff suggests,

Commerce need not have referred to "certain OCTG" and, instead, could have defined

the scope as covering only those enumerated products.  Here, Commerce reasonably

found that the language in the *Orders* reflects a broadening of the scope from that

initially proposed by the petitioners.  The narrow reading of the *Orders* that Plaintiff

proposes conflicts with the plain language of the *Orders* that specifically deleted a

limiting term once proposed by the petitioners.  Although the description of merchandise

in the petition may aid Commerce in making its scope determination, "that description

'cannot substitute for language in the order itself' because [i]t is the responsibility of

[Commerce], not those who [participated in] the proceedings, to determine the scope of

the final orders.'"  *Meridian Prods.*, 851 F.3d at 1382 (quoting *Duferco Steel*, 296 F.3d at

1097) (alterations in original).  That is precisely what Commerce did here when it altered

the proposed scope language in initiating the investigations, and adopted the revised

language in the *Orders*.  As the U.S. Court of Appeals for the Federal Circuit has

explained, "[t]he purpose of the petition is to propose an investigation. . . .  Commerce's

final determination reflects the decision that has been made as to which merchandise is

within the final scope of the investigation and is subject to the order."  *Duferco Steel*,

296 F.3d at 1096 (internal citations omitted).

### ii.   The ITC's Investigation and Final Determination

In determining the meaning of the scope language, Commerce reviewed

definitions of OCTG referenced in the ITC's final injury determination and by the AISI,

both of which Plaintiff included in its scope ruling request.  Remand Results at 19-20,

23-26, 30-31; *see also* Scope Ruling Request, Ex 8 (AISI Manual) at 33; *id.*, Ex. 9

(Certain Country Tubular Goods from China, USITC Pub. 4124, Inv. No. 701-TA-463

(Jan. 2010) ("ITC Final Det.")) at 5.  In 1982, the AISI defined OCTG as a "collective

term applied to the drill pipe, casing and tubing used in the drilling of a well and

conveying the oil or gas products to the surface."  AISI Manual at 33.  In its final injury

determination, the ITC referenced AISI as having defined six end-use categories for

steel pipes and tubes, one of those categories being OCTG.  ITC Final Det. at I-9.  In a

footnote appended to that sentence, the ITC defined OCTG as "steel pipes and tubes

used in the drilling of oil and gas wells and in the conveying of oil and gas from within

the well to ground level."  *Id*. n.16.  In the main text in its final injury determination, under

"Product Description," the ITC defined OCTG as "tubular steel products used in oil and

gas wells," including "casing, tubing, and coupling stock of carbon and alloy steel."  *Id.*

at 5.[7]  Commerce adopted the latter definition as the more relevant to the present

determination.  Remand Results at 20.

Plaintiff argues that in analyzing the ITC's determination, Commerce made

arbitrary choices, electing to adopt some of the ITC's statements and disregard others.

Pl.'s Comments at 6.  First, it argues that Commerce erred in framing the definition of

OCTG as "a choice between the ITC's definition of OCTG . . . and the definition of the

AISI" because the ITC specifically incorporated the AISI definition.  *Id*. at 7.  Next, it

argues that the agency disregarded the ITC's specific descriptions for casing, tubing,

and coupling stock, each of which described the product's function in "drilling and

conveyance of oil and gas."  *Id*. at 8-9.  According to Plaintiff, the agency disregarded

these product details as well as the ITC's more specific definition that OCTG are "steel

pipes and tubes used in the drilling of oil and gas wells and in the conveying of oil and

gas from within the well to ground level," in favor of the "most generic" statement that

OCTG is tubing used in oil and gas wells.  *Id*. at 8.  Plaintiff further argues that nothing

in the ITC's final determination "lend[s] credence to Commerce's conclusion that the

ITC's definition went beyond casing, tubing and coupling stock to include other products

that are 'associated with an oil and gas well.'"  *Id*. at 9.  Each of these points were

addressed by the agency and each of these arguments fail before this court.

Commerce agreed that the AISI's definition is "not separate and distinct from the

ITC's definition" and found, as Plaintiff avers, that the ITC's definition "incorporates

AISI['s] definition into it."  Remand Results at 30.  But the agency found, and reasonably

---

[7] Immediately following this definition, the ITC included detailed descriptions for casing, tubing, and coupling stock.  ITC Final Det. at 5.

explained, that the ITC broadened AISI's definition to be "more inclusive," so that it is

not limited to casing, tubing, and coupling stock. *Id*. at 30-31.  Moreover, in explaining

that OCTG is not limited to drilling and extraction, the agency stated that "while the AISI

definition may only define OCTG to include tubular steel products used in drilling and

extraction, the ITC's definition defines OCTG to include tubular steel products used in

drilling, extraction, and other functions associated with an oil and gas well."  *Id*. at 30-31.

The scope language and the ITC's final determination support these statements.

  As Commerce explained, the AISI's definition "does not expressly preclude other

'hollow steel products of circular cross-section'" from being OCTG and "the ITC's

definition recognizes this fact by stating that OCTG are: 1) 'tubular steel products used

in oil and gas wells and' 2) '*include* casing, tubing, and coupling stock of carbon and

alloy steel.'"  Remand Results at 19.  This inclusive nature of the definition is reflected in

the scope.  *See AD Order*, 75 Fed. Reg. at 28,553 ("Certain OCTG . . . including oil well

casing and tubing").  Moreover, the ITC's final determination discussed "[r]ecent

advancements in oil and gas exploration technologies" that "have enabled gas wells to

reach locations that were previously deemed cost prohibitive," and "application of new

technologies" that has significantly increased gas production.  ITC Final Det. at I-10; *see

also* Pl.'s Comments on the Draft Remand Results (May 17, 2017) ("Pl.'s Draft

Comments"), Ex. 2 (Staff Report to the ITC on OCTG from China) (Dec. 18, 2009)

("Staff Report") at I-11, PJA 14, PRR 4-5, ECF No. 67.  These advancements weighed

in favor of a more inclusive definition of OCTG than that provided in 1982 by the AISI.

Remand Results at 19-20, 20 n.114.  Figure 1-3 in the ITC's final determination and

Staff Report, which pertains to these "recent advancements," includes a description of

"[c]asing and [t]ubing for shale gas drilling technology" and depicts a five-step process

of how "[a]dvances in technology are putting vast shale gas reserves within reach of

developers."  ITC Final Det. At I-13 (Figure 1-3); Staff Report at I-13 (Figure 1-3).  The

figure explains that step three of the drilling process is when "cement is injected through

the casing to fix it in place.  A perforating gun shoots holes through the casing and

cement."  *Id*.  Commerce cited this portion of the ITC's determination, and reasoned that

"[i]n light of these recent technological advancements," it found the ITC's more inclusive

definition to be more relevant to the present determination.  Remand Results at 20

(citing ITC Final Det. at I-10 (citing *id.* at Figure 1-3)).

        The agency's intention to give effect to the more inclusive definition is further

"evidenced by the specific exclusions within the scope language for drill pipe,

unattached couplings, and unattached thread protectors."  *Id*. at 26; *see also id.* at 31 &

n.160 (noting that drill pipe is explicitly excluded from the *Orders* but has been included

in other antidumping duty orders on OCTG) (citing *Oil Country Tubular Goods From*

*Mexico*, 60 FR 41056 (Dep't Commerce Aug. 11, 1995) (antidumping duty order)).  If

Commerce intended the definition of OCTG to be as limited as Plaintiff suggests, such

express exclusions would be superfluous.  *Id*. at 31.  Additionally, that OCTG could

include tubular steel products used in other functions associated with an oil and gas well

other than drilling and extraction is further supported by the ITC's report.  *Id*.  The ITC

described casing as "a circular pipe that serves as the structural retainer for the walls of

the well . . . [and] is used in the well to provide a firm foundation for the drill string by

supporting the walls of the hole to prevent caving in both drilling and after the well is

completed"; *i.e.*, casing is not used in the drilling or extraction processes.  ITC Final Det.

at 5.  Although Plaintiff cites coupling blanks as an example of a product that could be

considered "'associated with an oil and gas well' . . . that the ITC expressly indicated to

be outside the scope," Pl.'s Comments at 9, this argument is unpersuasive.  The ITC

stated that coupling blanks were not within the scope, not that coupling blanks could not

be considered OCTG.  *See* ITC Final Det. at 5 ("Only coupling stock, not coupling

blanks or couplings, is within Commerce's scope.").

Plaintiff also points to the ITC's questionnaires in the preliminary phase of the

investigation that requested parties to report only casing and tubing and the ITC's

questionnaires in the final phase of the investigation requesting only casing, tubing, and

coupling stock as further evidence that undermines Commerce's inclusive interpretation

of the scope language.  Pl.'s Comments at 20.  As Commerce explained, however, even

if casing, tubing, and coupling stock were the primary OCTG products examined, the

ITC never stated that OCTG was limited to only these enumerated products.  Remand

Results at 25.  Similar to the proposition that "a petition need not expressly and

specifically identify all the products covered by the order at issue," *Novosteel SA v.*

*United States*, 284 F.3d 1261, 1269 (Fed. Cir. 2002), the ITC need not collect pricing

and other information on every possible product that may be covered by the scope.

Thus, contrary to Plaintiff's assertions, Commerce analyzed the definitional

statements as a whole, taking into consideration the ITC's determination, and found that

an inclusive interpretation is consistent with the scope language. *See* Remand Results

at 26 ("[V]iewed as a whole, the official definition of OCTG provided by the ITC is not

limited to merchandise used specifically in drilling or conveying, but encompasses other

tubular steel products used in oil and gas wells.").  The agency's interpretation is

consistent with the scope language and reasonable in light of the (k)(1) factors

discussed herein.  "[T]he court will not re-weigh the evidence presented to Commerce

and will uphold decisions by Commerce when the agency chooses from among the

range of possible reasonable conclusions based on the record."  *Ethan Allen*

*Operations, Inc. v. United States*, 39 CIT __, __, 121 F. Supp. 3d 1342, 1348 (2015)

(internal quotation marks and citation omitted).

### iii.  Prior Scope Rulings

Plaintiff argues that Commerce's interpretation of the scope of the *Orders* is

inconsistent with the agency's interpretation of the scope in the second remand

redetermination in *Bell Supply Co., LLC v. United States*.  Pl.'s Comments at 10-11

(citing Pl.'s Draft Comments, Ex. 7 (Final Results of Second Redetermination Pursuant

to Remand, *Bell Supply Co., LLC v. United States*, Consol. Court No. 14-00066 (Dep't

Commerce Aug. 11, 2016) ("*Bell Supply* Second Remand Results"))).  Specifically,

Plaintiff argues that the agency's definition here is inconsistent with the agency's

statement in *Bell Supply* that OCTG is "intended to be used in the extraction of oil and

gas."  Pl.'s Comments at 11 (*citing Bell Supply* Second Remand Results at 17).  In

considering this very argument, Commerce stated:

> the language in *Bell Supply* discusses certain types of OCTG (green tube
> and limited service) and extraction. However, the definition of OCTG is
> greater than just these types of OCTG or just extraction. Therefore, we do
> not find that the current proceeding conflicts [with] or contradicts our
> decision in *Bell Supply*.

Remand Results at 33.

Commerce's interpretation of the scope in *Bell Supply* addressed the question of

"whether unfinished OCTG (including green tubes) produced in the PRC, regardless of

where the finishing of such OCTG takes place," is included in the scope of the *Orders*.

*Bell Supply* Second Remand Results at 2.  Thus, the issue in Bell Supply was not one

concerning the definition of OCTG generally.  Rather, the issue was one of country of

origin of particular OCTG, specifically green tubes manufactured in the PRC and

finished in a third country.  *See id*.  Nothing in the *Bell Supply* redetermination suggests

that the agency was engaged in a comprehensive definition of OCTG that would be

definitive here.  Therefore, Commerce's determination in this case does not conflict with

that in *Bell Supply*.

### c.  Substantial Evidence Supports Commerce's Finding That Gun Carrier Tubing Meets the Definition of OCTG

Having found that Commerce reasonably interpreted the scope to cover hollow

steel products of circular cross-section used in oil and gas wells, except for products

expressly excluded from the scope, the court also finds that substantial evidence

supports Commerce's determination that Plaintiff's gun carrier tubing falls within the

scope of the *Orders*.  In its scope ruling request, Plaintiff described its gun carrier tubing

as "mechanical tubing" that is seamless, "custom-designed," and "engineered for a

specific end-use as a perforating gun carrier."  Scope Ruling Request at 2.  A

"perforating gun" is a "tool[] used in connection with oil and gas drilling and production."

*Id*. at 4.  Plaintiff explained that "[a] perforating gun assembly is a single-use device

used to perforate existing oil and gas wells in preparation for production using explosive

oil charges," and that "[p]erforating tools generally consist of a tube called the carrier[,]

which holds the charge holder . . . ." *Id*. (internal quotation marks and citations omitted).

The perforating gun is "lowered into the well and fired by the detonation of explosive

charges [that] are contained inside the tube charge holder."  *Id*.  Commerce, therefore,

reasonably found that the gun carrier tubing is a hollow steel product of circular cross

section that is used in oil and gas wells.  Remand Results at 20.  Moreover, as

explained below, the fact that the gun carrier tubing is part of a perforating system does

not preclude the product from meeting the definition of OCTG and being covered by the

scope of the *Orders*.  *See id*.

Notably, Commerce did not interpret the scope of the *Orders* to cover only OCTG

products that are necessary for "every oil well and every oil well completion" as Plaintiff

suggests.  Pl.'s Comments at 13.  Commerce explained that Plaintiff's product, gun

carrier tubing, is covered by the scope of the *Orders* because "it is essential to

extracting oil and gas from the shale formations which are hydraulically fractured."

Remand Results at 32.   In its scope ruling request, Plaintiff explained that gun carrier

tubing is incorporated into a perforating gun used to detonate inside oil wells.  Scope

Ruling Request at 2.  "[P]erforating guns . . . perforate wells in preparation for

production," *id*., and "[i]t is through these perforations that oil and gas flows into the well

bore and up to the surface," *id*. at 4.  Moreover, Plaintiff highlighted the essential

function of the gun carrier tubing by stating that "[a]ll the efforts that go into well

completion lead to the defining moment when the perforating guns punch holes through

OCTG casing and rock to connect the oil or gas reservoir to the well."  *Id*. at 5.  In light

of this evidence, Commerce reasonably stated that "without perforation of the casing,

which requires gun carrier tubing, there would be no operational oil and/or gas well."

Remand Results at 32.  The court does not read Commerce's determination as

conflating gun carrier tubing with a perforating gun or as indicative of a finding that gun

carrier tubing itself is capable of perforating the casing of an oil well, as Plaintiff

suggests.  Pl.'s Comments at 14.  Indeed, in its brief Plaintiff recognizes that the gun

carrier tubing is an "integral component of a perforating gun," *id.* at 13, and at oral

argument, Plaintiff stated that its gun carrier tubing is not used for any purpose other

than to be manufactured into perforating guns, Oral Arg. at 1:10:38-1:11:11.[8]

      Next, Plaintiff posits that the gun carrier tubing is never used in an oil well directly

but as a "component of a perforating gun."  *Id.* at 13.  As Commerce explained,

however, "nothing in the scope of the *Orders* indicates that OCTG must be a stand-

alone product."  Remand Results at 34.  In response to this argument below, Commerce

cited drill pipe as an example of OCTG that would be covered by the scope but for its

specific exclusion.  *Id.* at 34.   Drill pipe "is that tubular member which is used as a tool

to rotate the bit and to carry circulating drill fluid down to the bit where it is circulated

back on the outside of the pipe and carries the cuttings to the surface where they are

removed on a shale shaker prior to the return of the drilling mud to the system."  AISI

Manual at 33.  Thus, drill pipe is an OCTG product that is used in concert with another

component and removed from the well after use.  *See id.*; Remand Results at 34 ("[D]rill

pipe is a type of OCTG and it is removed from a well after its use in the drilling

process.").  This reasoning supports Commerce's determination that OCTG need not be

a stand-alone product.

---

[8] While Plaintiff argues that "it is not essential to use perforating guns to extract the oil
or gas as it depends upon the formation and the completion type," Pl.'s Comments at
13, this is immaterial with respect to the specific inquiry here — whether gun carrier
tubing meets the definition of OCTG and falls within the scope — because by Plaintiff's
own admission, the only use of gun carrier tubing is to be manufactured into perforating
guns that are used in the drilling process, *see id.*

### d.  Commerce did not Unlawfully Revise the Scope

Plaintiff states that its gun carrier tubing is mechanical tubing because it is made

to an internal specification based on, but exceeding, the American Society for Testing

and Materials ("ASTM") A-519 standard developed by its engineers.  Pl.'s Comments at

22.[9]  Plaintiff argues that mechanical tubing was not part of the original investigation

and, thus, Commerce unlawfully revised the scope.  *Id.* at 22-24; *see also* Confidential

DynaEnergetics U.S., Inc.'s Br. in Supp. of its Rule 56.2 Mot. for J. on the Agency R.

(Pl.'s Br.") at 29-35, ECF No. 32 (arguing that neither Commerce nor the ITC defined

OCTG to include mechanical tubing, and that the ITC treated OCTG and mechanical

tubing separately in its material injury investigation).  Moreover, Plaintiff states that

"Commerce has not explained how it would determine what characteristics differentiate

OCTG from mechanical tubing."  Pl.'s Comments at 22.  Additionally, Plaintiff advocates

for a formal inquiry under the (k)(2) factors because none of the (k)(1) factors "discuss[]

a product with the characteristics of [gun] [c]arrier [t]ubing or demonstrates any intention

to include other tubing products – such as mechanical tubing – in the investigation on

OCTG."  *Id.* at 25.

A plain reading of the scope shows that it clearly and unambiguously covers

OCTG "whether or not conforming to API or non-API specifications."  *AD Order*, 75 Fed.

Reg. at 28,553.  This language indicates that standards and specifications are irrelevant

when determining whether a product is within the scope of the *Orders*.  Thus,

Commerce's statement that "whether gun carrier tubing conforms to an API or ASTM

---

[9] The internal specification exceeds the requirements of the ASTM A-519 standard "in terms of its enhanced chemistry, impact resistance properties and different testing requirements."  Pl.'s Comments at 22.

specification associated with OCTG is not determinative of whether gun carrier tubing is covered by the scope" is reasonable.  Remand Results at 21.  As Commerce made clear, if a product is a tubular steel product used in an oil or gas well and is not otherwise excluded from the scope, Commerce considers it OCTG, even though the parties might define it or advertise it as mechanical tubing.  *Id.* at 28.  For example, coupling stock is included in the scope of the *Orders* even though the petitioners alerted the agency that coupling stock could be imported under either OCTG or mechanical tubing classifications.  Petitioners' QR Resp. at 3 (stating that "[c]oupling stock is imported either under the OCTG classifications or under the seamless mechanical tubing subheading of the HTSUS. . . . The HTSUS subheadings for coupling stock, however, are a basket category and will include other types of mechanical tubing that are not coupling stock.").

Plaintiff contends that the scope language regarding specifications was intended to address only limited service OCTG and OCTG green tubes which do not meet the API 5 CT standard.  Pl.'s Comments at 24.  Plaintiff relies on a response by petitioners to Commerce's request to define limited service OCTG products and green tubes.  *Id.* The petitioners defined the former as "consist[ing] of casing and tubing products that do not meet . . . [API] standards for OCTG," and the latter as "generally classified as semi-finished pipes used to make casing and tubing products[, and] . . . are typically non-API certified . . . ."  Petitioners' QR Resp. at 5-6.  As Commerce explained, however, "if this language were meant to address only limited service OCTG and green tubes, the scope language would have made specific reference to that."  Remand Results at 35.

Contrary to Plaintiff's argument that "Commerce has not explained how it would determine what characteristics differentiate OCTG from mechanical tubing," Pl.'s Comments at 22, Commerce explained that the gun carrier tubing is OCTG because it is used in oil and gas wells and meets the scope's requirements.  Remand Results at 28; *see also AD Order*, 75 Fed. Reg. at 28,553 (reciting the scope language).  No other mechanical tubing was before the agency and it was under no obligation to address such hypothetical questions.

With respect to Plaintiff's argument that Commerce and the ITC treated OCTG and mechanical tubing as distinct product types, *see* Pl.'s Br. at 29-30, Commerce took notice that although its antidumping duty questionnaire did not include an "other" category in addition to casing, tubing, and coupling stock, the questionnaire included language informing a company that believed it had "reason to report its U.S. sales on a different basis," to "contact an official in charge before doing so."  Remand Results at 26 (quoting Scope Ruling Request, Ex. 13 (Commerce's Sec. C Antidumping Duty Questionnaire)).  It reasoned that if a manufacturer of gun carrier tubing responding to the questionnaire believed that its product did not fit the matching criteria, "it need only contact the [agency] for guidance; but lack of a perfect fit with the matching criteria does not allow a party to reach any conclusions about whether its products are covered by the scope of an order."  Remand Results at 25.

With respect to Plaintiff's request for a formal scope inquiry because none of the (k)(1) factors specifically discuss gun carrier tubing or mechanical tubing, Pl.'s Comments at 24-26, Commerce properly explained that "[t]he question is not whether the scope language, petition or ITC investigation expressly mentions the particular

article in question, but whether the descriptions of the covered product in those sources

and especially in the scope language – which must be written in general terms –

encompass the particular article in question."  Remand Results at 32-33; *see also id.* at

35 ("[N]ot all products must be expressly identified by a petitioner in order to be covered

by a scope.") (citing *Novosteel SA*, 284 F.3d 1261); *Novosteel SA*, 284 F.3d at 1269

("[A]bsence of a reference to a particular product in the Petition does not necessarily

indicate that the product is not subject to an order.")  The regulations recognize that

scope determinations may be necessary because scope orders must be written in

general terms.  *See* 19 C.F.R. § 351.225(a).  Indeed, "scope inclusions are written in

broad terms and then specific exclusions are carved out from the general terms."

*Power Train Components, Inc. v. United States*, 37 CIT __, __, 911 F. Supp. 2d 1338,

1343 (2013), *aff'd* 565 F. App'x. 899 (Fed. Cir. 2014).  Here, there are no specific

exclusions for mechanical tubing or gun carrier tubing; thus, Commerce's finding that

Plaintiff's gun carrier tubing is included in the scope of the *Orders* is supported by

substantial evidence.

### e. Commerce's CBP Instructions are not impermissively retroactive

Plaintiff's challenge to the scope determination having failed, the court turns to

Plaintiff's challenge to Commerce's instructions to CBP.  These customs instructions

ordered CBP to "[c]ontinue to suspend liquidation of entries of . . . certain tubing for

perforated gun carriers imported by DynaEnergetics" subject to the *Orders*.  CBP

Message Nos. 6057301 (AD) and 6057302 (CVD) (Feb. 26, 2016), PJA Tab 9, PR 21,

ECF No. 67.[10]  Plaintiff challenges Commerce's customs instructions as "retroactive"

and "unreasonable."  Pl.'s Comments at 26-28.  Relying on *AMS Assocs., Inc. v. United*

*States*, 737 F.3d 1338 (Fed. Cir. 2013), Plaintiff argues that the Remand Results

clarified the language of the *Orders* and this clarification should only have prospective

effect.  *Id*. at 27 ("[W]hen Commerce clarifies the scope of an existing antidumping duty

order that has an unclear scope, the suspension of liquidation and imposition of

antidumping cash deposits may not be retroactive but can only take effect on or after

the date of the initiation of the scope inquiry.") (quoting *AMS,* 737 F. 3d at 1344)

(alteration in original) (internal quotation marks omitted).  Plaintiff further relies on

*United Steel & Fasteners, Inc. v. United States*, 41 CIT __, 203 F. Supp. 3d 1235 (2017)

and *Sunpreme Inc. v. United States*, 40 CIT __, 145 F. Supp. 3d 1271 (2016) to support

its position.  *Id.* at 27-28.

As noted, if the agency can determine, based solely upon the application and the

(k)(1) factors, whether a product is included within the scope of an order, the agency

"will issue a final ruling as to whether the product is included within the order."  19

C.F.R. § 351.225(d).  This is what the agency did here.  Pursuant to 19 C.F.R.

§ 351.225(l)(3), "[i]f the [agency] issues a final scope ruling, under [] paragraph (d) . . .

of this section, to the effect that the product in question is included within the scope of

the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) of this section

---

[10] On March 28, 2016, Commerce amended these instructions in light of the preliminary injunction entered by this court on March 14, 2016. *See* CBP Message No. 6088305 (Mar. 18, 2016), PJA Tab 10, PR 22, ECF No. 66; CBP Message No. 6088307 (Mar. 28, 2016), PJA Tab 11, PR 23, ECF No. 67.

*will continue*." 19 C.F.R. § 351.225(l)(3) (emphasis added).  Thus, the regulations

contemplate the possibility that suspension of liquidation had already begun.

   In its briefing, Plaintiff does not allege that its product was not subject to

suspension of liquidation so that Commerce's instructions to "continue" suspension of

liquidation of the merchandise would be appropriate in that limited (grammatical)

sense.[11]  Because the court finds that Commerce reasonably interpreted the scope of

the *Orders* to include the gun carrier tubing and because the gun carrier tubing already

was subject to suspension of liquidation, Commerce's instructions to CBP to continue

suspension of liquidation were in accordance with law.  *See id.*; *Shenyang Yuanda*

*Aluminum Indus. Eng'g Co. v. United States*, 38 CIT __, __, 961 F. Supp. 2d 1291,

1302-1305 (2014), *aff'd,* 776 F.3d 1351 (Fed. Cir. 2015).

   Plaintiff's reliance on *AMS,* 737 F. 3d 1338 to challenge Commerce's instructions

is unconvincing.  In *AMS*, Commerce issued clarification instructions during the course

of an administrative review that interpreted the scope of an existing antidumping duty

order to cover laminated woven sacks produced in China with non-Chinese fabric.  737

F.3d at 1340-41.  CBP had previously considered these sacks to be of non-Chinese

origin and was not suspending liquidation of them.  *Id.* at 1340.  Pursuant to its

"clarification," Commerce instructed CBP to suspend liquidation of those products

retroactive to the preliminary determination in the original investigation.  *Id*. at 1340-

1341.  In so doing, Commerce exceeded its authority under 19 C.F.R. § 351.225(l)(2)

because the antidumping duty order did not clearly cover that plaintiff's merchandise.

---

[11] At oral argument, Plaintiff's counsel stated that Customs had been suspending
liquidation of Plaintiff's product.  Oral Arg. at 30:55-31:03.

*Id.* at 1343.  The court held that "when Commerce 'clarifies' the scope of an existing

antidumping duty order that has an unclear scope, the suspension of liquidation and

imposition of antidumping cash deposits may not be *retroactive* but can only take effect

'on or after the date of the initiation of the scope inquiry.'"  *Id.* at 1344 (quoting 19 C.F.R.

§ 351.225(l)(2)).

The circumstances of *AMS* do not exist here.  Unlike in *AMS*, Commerce did not

clarify an ambiguous scope but, instead, applied the language of the scope to the gun

carrier tubing using the definition of OCTG derived from the scope's language itself and

the ITC's investigation.  Commerce was not required to initiate a formal scope inquiry

pursuant to 19 C.F.R. § 351.225 "when it wishe[d] to issue a ruling that [did] not clarify

the scope of an unambiguous order."  *AMS*, 737 F. 3d at 1344.  Rather,

> Commerce must only follow the procedures outlined in § 351.225 when it
> wishes to clarify an order that is unclear. To hold otherwise would permit
> importers to potentially avoid paying antidumping duties on past imports
> by asserting unmeritorious claims that their products fall outside the scope
> of the original order. Importers cannot circumvent antidumping orders by
> contending that their products are outside the scope of existing orders
> when such orders are clear as to their scope. Our precedent evinces this
> understanding. We have not required Commerce to initiate a formal scope
> inquiry when the meaning and scope of an existing antidumping order is
> clear.

*Id*. (citing *Huaiyin Foreign Trade Corp. (30) v. United States,* 322 F.3d 1369,

1378-79 (Fed. Cir. 2003)).  The court is not persuaded that the agency's

voluntary request for remand to explain its determination in more detail

constitutes a basis for finding that the language of the scope was unclear.  *See*

*SKF USA, Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001) ("[T]he

agency may request a remand, without confessing error, in order to reconsider its

previous position."); *see also* Remand Results ("DynaEnergetics states that the

[agency's] determination is 'based on a new definition of OCTG.' We disagree.
The definition we have used was the same definition used by the ITC, and the
language of the scope reflects that definition.") (footnote omitted).

The manner in which Commerce conducted the proceeding in this case is
analogous to the way in which Commerce conducted the proceeding in *Shenyang*, 961
F. Supp. 2d 1291, which the court finds instructive here.  In *Shenyang,* Commerce
determined that the language of the antidumping and countervailing duty orders on
aluminum extrusions from the PRC and the description of products subject to the scope
request — curtain wall units — were dispositive such that it was unnecessary to
consider the (k)(2) factors.  *Id*. at 1294.  Liquidation of the subject merchandise had
already been suspended since the publication of the preliminary determinations in the
antidumping and countervailing duty investigations.  *Id*. at 1303.  Accordingly, after
Commerce determined, based solely upon the application and the (k)(1) factors, that the
scope of the orders included the subject merchandise, it instructed CBP to "[c]ontinue to
suspend liquidation of entries" of the subject merchandise.  *Id*. at 1302.  As the court in
*Shenyang* explained, "[when], as here, a scope ruling confirms that a product is, and
has been, the subject of an order, the [agency] has not acted beyond its authority by
continuing the suspension of liquidation of the product."  *Id.* at 1304.  Unlike *AMS* and
like *Shenyang*, Commerce here "added no new products to the scope" but "merely
confirmed what had previously been the case."  *See id.* at 1303.

Plaintiff's reliance on *Fasteners*, 203 F. Supp. 3d at 1252, 1255 and *Sunpreme*,
145 F. Supp. 3d at 1289, does not persuade the court to hold otherwise.  Plaintiff cites
*Sunpreme* for the proposition that "goods should only be considered to fall within the

scope of antidumping and countervailing duty orders once the agency with the capacity

to interpret them has done so."  Pl.'s Comments at 28 (quoting *Sunpreme*, 45 F. Supp.

3d at 1289).  In *Supreme*, the court found that CBP "acts beyond its authority" when

it "attempts to determine whether a product falls within the scope based upon factual

information that the scope language does not explicitly call on CBP to consider."  145

F.Supp.3d at 1285. Yet, the court also stated that

> if Commerce issues a final scope ruling based solely upon the application,
> and suspension of liquidation had already occurred because CBP properly
> determined the plain language of the antidumping or countervailing duty
> order included the merchandise, any such suspension of liquidation will
> continue upon a final scope ruling to the effect that the product is included
> within the scope of an antidumping or countervailing duty order.

*Id.* at 1287.  *Fasteners*, on the other hand, is factually distinguishable because there

was an absence of suspension of liquidation of plaintiff's entries by Customs.  203 F.

Supp. 3d at 1240-41; *id.* at 1250 (recognizing that "[t]he relevant regulatory provisions

are ambiguous regarding the date that the Department must commence suspension of

liquidation when (1) Commerce has issued a final affirmative scope ruling without

having initiated a formal scope inquiry and (2) liquidation has not been suspended"); *id*.

at 1253-54 (distinguishing *Shenyang* because "in *Shenyang,* Commerce instructed

Customs to continue to suspend liquidation, as opposed to suspending liquidation for

the first time").

CONCLUSION

For the foregoing reasons, the court finds that Commerce reasonably determined

that gun carrier tubing is included in the scope of the *Orders*.  Because that conclusion

was reasonable, the court finds that the factors set forth in 19 C.F.R. § 351.225(k)(1)

were dispositive such that Commerce properly ended its analysis without considering

the (k)(2) factors.  *See* 19 C.F.R. § 351.225(k)(1),(2).  Moreover, because the court

finds that Commerce reasonably interpreted the scope language of the *Orders* to

include the gun carrier tubing and that liquidation of the gun carrier tubing had been

suspended, Commerce's instructions to CBP to continue suspension of liquidation of

the merchandise were not erroneous.  Plaintiff's request that the court remand the

Remand Results is DENIED.  Judgment will enter accordingly.


                                                            /s/      Mark A. Barnett
                                                                        Judge


Dated: March 16, 2018
            New York, New York